# HUGH RITCHIE

## *v.*

## S. CORNING JUDD *et al.*

### *Filed at Ottawa May 13, 1891.*

1. MORTGAGE—*sale thereunder—notice to mortgagor—sufficiency of notice.* A note secured by mortgage on lots was put in the hands of real estate brokers for collection, and the mortgagor also employed them to sell the lots. A private sale was made, which fell through, for the reason the title did not appear good, whereupon the mortgagor ceased to rely on the brokers and looked elsewhere for advice. The brokers then had the property sold under the power of sale in the mortgage, without personal notice to the mortgagor, and it was bought by one having no privity or connection with the brokers : *Held,* that the brokers were not guilty of a betrayal of trust.

2. The failure to give the mortgagor personal notice of a sale under a power in a mortgage will not invalidate the sale, where the purchaser has no notice that the mortgagee purposely concealed the sale from the mortgagor. The parties may stipulate for personal notice to the mortgagor, of the time and place of the sale, but if they do not, the failure to give such notice will not affect the power to sell.

3. Where the purchaser at a sale under a power in a mortgage is neither party nor privy to any arrangement to prevent the mortgagor from having notice of the sale, it will be sufficient if all the notice of the sale was given which the mortgage requires.

4. SAME—*second sale—validity thereof.* Where a sale is made under a power in a mortgage, upon due and proper notice, the power will be exhausted, and a second sale under the fear of some defect in the first will be a nullity, and the purchaser under both sales will not be estopped from relying upon the validity of the first sale.

5. A sale under a power in a mortgage will not be set aside, on the bill of the mortgagor, from the fact that the sale was twice advertised, when the second notice was made necessary to obviate a defect in the first, and the sale was made under the last notice, and no injury was shown to have resulted from having the two notices published.

6. SAME—*agreement to bid at the sale, and preparation of notices— whether fraudulent.* An agreement between the holder of a mortgage containing a power of sale and one expecting to buy the land, that the latter shall bid at the foreclosure sale under the power the full sum due on the mortgage, and buy up some adverse claims, which agreement contains no provision that the premises shall be sold to him

unless he is the highest bidder, is not fraudulent as to the mortgagor, there being nothing in it to prevent competition in bidding.

7. If a party, in the expectation of becoming the purchaser of property at the sale thereof under a power of sale, supervises the notices of the sale, so that they are in accordance with the terms of the deed of trust or mortgage, this will not authorize the mortgagor to have the sale to such party set aside, when it does not appear that the mortgagor has sustained any injury thereby.

8. A person expecting to bid at the sale of land under a power in a mortgage may assist or advise as to the notices of the sale, and if such notices are prepared under his supervision, that fact can not be held to prove that he had himself purchased the mortgage debt and was himself foreclosing, over positive evidence to the contrary.

Appeal from the Superior Court of Cook county; the Hon. H. M. Shepard, Judge, presiding.

Mr. A. T. Galt, and Messrs. Hanecy & Merrick, for the appellant:

Any agreement among parties not to bid against each other at a public sale of land, being designed and calculated to stifle competition, is such a fraud as to afford ground of avoiding the sale as against a purchaser participating in the fraud. *Loyd* v. *Malone,* 23 Ill. 43.

A trustee or a mortgagee can not become a purchaser at his own sale. *Mapps* v. *Sharpe,* 32 Ill. 13; *Griffin* v. *Marine Co.* 52 id. 130; *Roberts* v. *Fleming,* 53 id. 196; *Watson* v. *Sherman,* 84 id. 263; *Williams* v. *Rhodes,* 81 id. 571; *Gibbons* v. *Hoag,* 95 id. 45; *Ventres* v. *Cobb,* 105 id. 33; *Hamilton* v. *Lubukee,* 51 id. 415.

A purchaser under a power of sale purchases at the peril of the sale being void, if a material condition precedent to the exercise of the power does not exist. A sale without the existence of such condition precedent is one not authorized by the power, and no title can pass by it. *Shippen* v. *Whittier,* 117 Ill. 282.

The doctrine of *caveat emptor* applies to a judicial sale. *Bassett* v. *Lockard,* 60 Ill. 164; *Roberts* v. *Hughes,* 81 id. 130;

*Bond* v. *Ramsey,* 89 id. 29; *Gunnell* v. *Cockerill,* 84 id. 319; *Redden* v. *Miller,* 95 id. 337.

On a sale under a power of sale in a mortgage or trust deed the utmost good faith is required of a trustee or mortgagee, and reasonable certainty and publicity given of the time, place and terms of sale.

The trustee in a deed of trust is the agent of the grantor and his assigns, as well as of the creditor thereby secured, and it is his duty to protect the interests of all parties by acting in good faith in conducting the sale.   *Webber* v. *Curtiss,* 104 Ill. 309; *Clevinger* v. *Ross,* 109 id. 349; *Mathison* v. *Prescott,* 86 id. 493; *Stone* v. *Williamson,* 17 Ill. App. 175; *Rounsavell* v. *Crofoot,* 4 Bradw. 671; *Flint* v. *Lewis,* 61 Ill. 299; *Ventres* v. *Cobb,* 105 id. 33; *Hamilton* v. *Lubukee,* 51 id. 415; *Gibbons* v. *Hoag,* 95 id. 45.

A person purchasing of an agent is bound, at his peril, to see that the agent has authority to make the sale.   *Davidson* v. *Porter,* 57 Ill. 300; *Reynolds* v. *Ferree,* 86 id. 570.

Where there is a conspiracy by the holder of a note secured by a trust deed, to take advantage of the grantor in the trust deed, and, by an abuse of the trust, wrongfully to deprive him of his equity of redemption, the right of the latter to relief rests upon the clear and solid ground of equitable jurisdiction over trusts, for the control of all the fraudulent abuses of them, unless barred by the paramount claims of a *bona fide* purchaser for valuable consideration and without notice.

Where a person is, and for thirty years has been, in the open and visible possession of a tract of land as his farm and residence, that possession is notice to all the world that he has some interest in the land, and whoever buys it while that possession continues takes it subject to that interest, whatever it may be.   *Flint* v. *Lewis,* 61 Ill. 299.

Where an agent entrusted with funds to pay the taxes violated his trust and permitted the sale, this, and positive proof

of fraud of a similar character, of course, render the sale void. Blackwell on Tax Titles, 392.

Conveyance by attorney must be executed in the name of the principal. A mortgage containing a power of sale authorizing the mortgagee, his personal representatives or assigns, to sell the premises, and, as the attorney of the mortgagor, to execute a deed to the purchaser, *held,* that the assignee of the mortgagee could only convey the title as the attorney of the mortgagor, and by using the name of his principal in the conveyance. A deed made by the assignee in his own name, as grantor, was held not to pass the title. *Speer* v. *Hadduck,* 31 Ill. 439; *Barrett* v. *Hinckley,* 124 id. 32.

Messrs. LYMAN & JACKSON, for the appellees:

No fraud or conspiracy is proved against appellant, John Ritchie, or on the part of Mead & Coe, or on the part of Judd.

The agency of Mead & Coe, in connection with the Burnt Records act, and all obligations resting upon them toward Hugh Ritchie, were terminated prior to the arrangement with Amos Bostwick and S. Corning Judd to foreclose the mortgage.

No duty existed on the part of Mead & Coe, or any one, to notify Hugh Ritchie of the foreclosure sale. The mortgage required no such notice.

Messrs. JUDD, RITCHIE & ESHER, and Mr. W. C. GOUDY, for the appellee Judd:

The agreement of Judd to bid at the sale could not have prevented competition, as it was not known to any but the parties to it, and it in fact secured a purchaser in any event, and did not bind him not to accept a higher bid, if offered.

Mr. CHIEF JUSTICE SCHOLFIELD delivered the opinion of the Court:

This appeal brings before us for review a decree of the Superior Court of Cook county, dismissing the bill of complaint in a certain cause wherein Hugh Ritchie is complainant,

and S. Corning Judd, Edward C. Wentworth, John Ritchie, Aaron B. Mead, Albert L. Coe and Edward O'Hara are defendants.

On the 15th of June, 1865, the sheriff of Cook county made a tax deed to Hugh Ritchie for lots 1 and 2, in block 3, of H. O. Stone's subdivision of Astor's addition to the city of Chicago, and on the 13th of September, 1865, the mayor of Chicago also made to him a tax deed for the same property. Thereafter, claiming to be in the exclusive possession of these lots, and to have paid all taxes and assessments thereon, on the 30th day of December, 1873, Hugh Ritchie conveyed them, by way of mortgage with power of sale, to his brother, John Ritchie, of Liverpool, England, to secure the payment of a promissory note for $3500, from the former to the latter, dated February 1, 1874, payable six months after date, and bearing interest at the rate of ten per cent per annum, payable half-yearly. The note not having been paid, on the 15th of January, 1880, John Ritchie sent it, together with the mortgage, to Aaron B. Mead and Albert L. Coe, a firm of real estate brokers doing business in Chicago under the firm name of Mead & Coe, for collection. Mead & Coe made several efforts to collect the amount due from Hugh Ritchie, which were unavailing, but by the consent of John Ritchie, coercive measures under the mortgage were delayed from time to time. At one time Hugh Ritchie offered to give a deed to John Ritchie for the lots, in satisfaction of the debt, but being informed that John Ritchie would not agree to that, he then agreed to co-operate with Mead & Coe to effect a sale of the lots for the purpose of paying the note and interest. This being satisfactory to John Ritchie, on the 19th of May, 1883, Mead & Coe placed the property upon their books for sale, the figures first agreed upon as the price being $4500, but this was afterward increased to $8800.

In November, 1883, Mead & Coe made a contract with John H. Batterman for the sale of the lots to him for $9000. Of

this, $500 was paid down as earnest money, and the remainder, $8500, was to be paid on the delivery to Batterman of a good and sufficient warranty deed for the lots within thirty days from the date of the contract, or as soon thereafter as the title should be examined and found good, but it was provided that if the title should not prove good the $500 should be returned to Batterman. The abstract of title showed that the title of Hugh Ritchie rested entirely on his tax deeds, and that the patent title to the lots was in Amos Bostwick, who had obtained a deed therefor in 1856. Hugh Ritchie claimed that his title was superior to that of Bostwick, but not furnishing satisfactory evidence thereof to the attorney of Batterman, the contract was rescinded and the $500 advanced was returned to Batterman.

Subsequently, about the 3d of June, 1884, Hugh Ritchie authorized Mead & Coe to have their attorneys, Messrs. Lyman & Jackson, file a bill in his name, under the Burnt Records act, to establish his title. The bill was filed, and Amos Bostwick was made defendant. He appeared and answered, setting up his patent title and claiming its superiority, and he also filed a cross-bill, praying that his title be decreed established as the paramount title. The case was continued along, from term to term, and Hugh Ritchie failed to furnish evidence which his attorneys thought would be sufficient to establish his title as paramount to that of Bostwick. It appears from his examination that during all that time he had in his possession important evidence in that respect, which he willfully withheld, through a distrust of Mead & Coe and Lyman & Jackson. In view of this failure to furnish evidence, Lyman & Jackson advised a compromise with Bostwick, believing, as they informed Hugh Ritchie, that in the event of a trial of the pending suit the title of Bostwick would prevail. Accordingly, an offer was make by Mead & Coe to purchase Bostwick's title for $2500, which was rejected by Bostwick. This offer had the approval of John Ritchie, but not that of

Hugh Ritchie, who, though refusing to produce the requisite evidence of that fact, continuously persisted in claiming the superiority of his own title.

About the 1st of October, 1886, Hugh Ritchie and Mead & Coe had an interview, in which, as they claim, he terminated whatever agency they previously had to act on his behalf, and he then notified them that he should thenceforward protect himself and look elsewhere than to them for aid. Meanwhile, before that time, in the month of August of the same year, one Merigold, of the firm of W. D. Kerfoot & Co., real estate brokers in Chicago, having learned at what price the Bostwick title could be obtained and for what sum John Ritchie would sell his note and mortgage, had undertaken to make a contract with S. Corning Judd for their sale, but Judd had declined to enter into the contract, for the alleged reason that, though willing to buy the title, he was not willing to buy the note and mortgage. Afterwards, on the 5th of October, 1886, John Ritchie, under the advice of Mead & Coe, assigned the note, and conveyed, by deed, his title and interest in the lots as mortgagee to Edward C. Wentworth, a member of the firm of Mead & Coe, for the purpose of having him foreclose by a sale of the property, pursuant to the power in the mortgage. On the 23d of October, 1886, an agreement in writing was made and entered into by and between Edward C. Wentworth, Amos Bostwick and S. Corning Judd, but by mistake it was dated October 1, 1886, as follows, to-wit:

"This agreement, made and entered into this first day of October, 1886, by and between Edward C. Wentworth, of the city of Chicago, in the county of Cook, and State of Illinois, party of the first part, Amos Bostwick, of the city of Minneapolis, in the State of Minnesota, party of the second part, and S. Corning Judd, of said city of Chicago, party of the third part:

"*Witnesseth:* That for and in consideration of the covenants and agreements of the said third party, as hereinafter set out,

the said first party (being the holder and owner of one certain
note made by Hugh Ritchie to one John Ritchie, of date of
February 1, 1874, and secured to be paid by a sale mortgage
of December 30, 1873, on lots one (1) and two (2), in block
three (3), in Stone's subdivision of Astor's addition to Chicago,
which said note and mortgage were, on the 5th day of October,.
1886, duly assigned to said first party,) hereby covenants and
agrees to foreclose said sale mortgage in the manner therein.
provided, and sell said lots as provided in said sale mortgage,
and also to procure from said John Ritchie a quit claim deed
to said lots to said third party, to be in readiness at the date
of said sale, on or before December 1, 1886, and will also im-
mediately have the abstract of title to said lots brought down
to date, and procure a tax abstract of said lots.

"And said second party, in consideration of said covenants
and agreements of said third party, hereinafter set forth, agrees.
on his part to make, execute, acknowledge and deliver to said.
third party a quit claim deed to said lots, the said second
party being the holder of the patent title to said lots, on the
date of the sale aforesaid, by said holder of said note and
mortgage, (said first party).

"And said third party on his part hereby covenants and
agrees that he will at said sale bid, or cause to be bid, for
said lots the sum or amount remaining unpaid on said note,.
both principal and interest, and will pay to said first party
the sum so bid, together with a sufficient sum, over and above
amount so due on said note, to make the aggregate sum of
eighty-nine hundred and forty-seven dollars ($8947) for said
quit claim deed from said John Ritchie, provided the said
abstract of title shall show said patent title to be in said sec-
ond party, and no incurable defects in the said title otherwise
than now appear by the present abstract; and said third
party further agrees and covenants that he will pay to said
second party the sum of four thousand and fifty-three dollars.
($4053) for said quit claim deed from said second party, by

which the patent title to said lots shall be vested in said third party, said payments aforesaid to be made at the time, of making said sale and delivery of the said several deeds hereinbefore referred to; and said third party further agrees to assume and pay all taxes and assessments on said lots for the year 1886, and also to assume the responsibility of pro-curing possession of said lots should the said possession be-claimed by any other person, by reason of any lease from said Hugh Ritchie or otherwise.

"Upon the fulfillment by said third party of each of the cov-enants and agreements by him, as hereinbefore set forth, said first party hereby agrees to make to him, said third party, his heirs or assigns, a deed to said premises without any expense to the said S. Corning Judd, provided the said lots are struck off and sold to him at the said sale for the amount hereinbe-fore by him agreed to be bid therefor. In case said lots shall be bid off for a greater sum or amount at said sale than herein agreed to be bid by said third party, then in that case the said first party shall procure from the purchaser or purchasers at said sale of said lots a good and sufficient deed or deeds con-veying the same to him, the said Judd, otherwise this contract to be void. Upon compliance with the conditions and of the covenants herein agreed to, by said parties of the first and second part, said third party is to make the payments herein by him agreed to be made, this agreement to be left *in escrow* with the Merchants' National Bank of Chicago, Illinois, until the same is, and the conditions therein are, fully complied with, and the same ready to be cancelled.

"Witness the hands of the several parties hereto, the day and year first above written."

Judd also afterwards verbally agreed to pay Kerfoot & Co. $500, as commissions, if the sale and conveyance should be consummated according to the agreement.

Henry Hudson, the attorney of Bostwick, prepared the no-tices for the foreclosure sale, which were subsequently sub-

mitted to Judd. They were in the form, and published, as required by the terms of the mortgage, in the *Chicago Legal News,* for four successive weeks, namely, on the 6th, 13th, 20th and 27th days of November, 1886, fixing the time of sale on the 7th day of December, 1886, and the place of sale at the door of the court house in Chicago. The lots were offered for sale at the time and place named in the notices, and there were at least two bids therefor. Judd, by his agent, bid the sum of $8947, as he had, by his contract, agreed to do, and that being the highest bid, the property was struck off to him, and the next day, Wentworth, as assignee of John Ritchie, trustee, made and delivered a deed conveying the lots to him, pursuant to this purchase. On the same day a quit claim deed, bearing date November 9, 1886, executed by John Ritchie and wife to Judd, was delivered to him, and there was also, at the same time, delivered to Judd the deed of Amos Bostwick, and after the delivery of these deeds Judd paid to Wentworth $8947, and to Bostwick $4053. The lots were, at the date of this sale, occupied by Edward O'Hara, as tenant of Hugh Ritchie, there being a small framed house thereon. O'Hara having declined to surrender possession, Judd brought an action for forcible detainer against him, in January, 1887. Pending the trial of that action, O'Hara accepted a lease from Judd, to terminate the 1st of April thereafter. At the end of that term, O'Hara having failed to surrender possession, Judd obtained a judgment against him in an action for forcible detainer, and a writ of possession was issued thereon, and Judd was, by virtue thereof, placed in the possession of the property.

The bill prays that the sale to Judd be set aside, and that Hugh Ritchie be allowed to redeem from the deed of trust, and for an account. The grounds upon which the relief is asked, are, first, that the defendant Judd entered into an arrangement with Mead & Coe, (who were the agents of Hugh Ritchie, with authority to sell the property at private sale,

and out of the proceeds to pay the amount due upon the mortgage,) to purchase said note and mortgage, and in pursuance of that arrangement Judd did purchase the note and mortgage, and had the same transferred, without consideration, to Edward C. Wentworth, the cashier of Mead & Coe; that after such assignment, Judd, in the name of Wentworth, published notices of sale, as specified in the bill; that Wentworth, under directions from Judd, went through a form of sale, at which the property was bid off for $8947, and that Wentworth, under the like directions from Judd, deeded the property to him, making false recitals as to the notice given,—and that these things were done by Judd, Wentworth, John Ritchie and Mead & Coe, for the fraudulent purpose of depriving Hugh Ritchie of the title to his property; second, that knowledge of the sale was intentionally concealed by Judd, Wentworth, John Ritchie and Mead & Coe from complainant; and third, that the notice of sale required by the mortgage was not given, but instead of four weeks it was published only three weeks, viz., on the 13th, 20th and 27th days of November, 1886, the sale being December 7, 1886. These grounds will be considered in the reverse order of their statement.

The third ground is unsupported by the evidence. The notices of sale were published in four consecutive issues of the *Legal News*,—namely, on the 6th, 13th, 20th and 27th of November,—as has been before stated, and that ground is abandoned by counsel in their argument.

The only foundation for the second ground is found in a letter of Mead & Coe to John Ritchie, dated October 23, 1886, in which they say: "On further consideration we all decided it would be just as well to foreclose without Hugh Ritchie's knowledge, if possible, as the information would only give him an opportunity to interfere by way of injunction, or some other legal proceedings." This letter was written by Mead, and in his examination as a witness he testified, that while he did not remember to whom he referred by the term "we," in that

letter, Judd did not participate in this arrangement, to his knowledge, adding, "that is, I do not remember that he did." Wentworth testified: "I have no knowledge of agreement or understanding that the foreclosure of the mortgage should be made, or that it was just as well to make it, without Hugh Ritchie's knowledge." And Judd himself testified, referring to this letter: "I never heard of the letter. * * * I was not a party to any such conversation or any such arrangement."

We find nothing in the record tending to show that Judd did or was privy to anything done to prevent Hugh Ritchie having knowledge of the sale. It was competent for Hugh Ritchie to agree what notice should be given before there should be a foreclosure and sale, and if this did not require a personal notice to himself, the failure to give him personal notice of the determination to sell, or of the time and place of sale, did not affect the power to sell. (*Irish et al.* v. *Antioch College et al.* 126 Ill. 474; *Equitable Trust Co.* v. *Fisher,* 106 id. 189; *Hoodless* v. *Reid et al.* 112 id. 105; *Princeton Loan and Trust Co.* v. *Munson,* 60 id. 371.) And so, since Judd was neither party nor privy to any arrangement to prevent Hugh Ritchie from having notice of the sale, it is sufficient that all the notice was given, and as it is required to be given by the deed of trust.

The first ground is equally unsustained by the evidence. In a letter written by Mead & Co. to John Ritchie, on the 31st of July, 1886, they inform him of an offer they had had from the attorney of Bostwick for his claim, but in their letter to him of September 18, 1886, which is put in evidence by appellant, they say: "In our last we mentioned that Bostwick's attorney has approached us, through another broker, asking what we would sell our claim for, and we named $10,000. Since then he has been to see us, and stated he had a customer for it, and we finally, after considerable negotiations and conferences with Lyman, agreed to take $8700 cash for the note, and a quit

claim from you for your interest in the property as obtained by tax title. Out of this $8700 you will have to pay the amount we have advanced for taxes, as per statement sent in our letter of July 31, of $728.73, and the tax claim of $299.86, also our commissions, and attorneys' fees and court costs, which would altogether be, in round numbers, $1000, so that the sale would net you not far from $6671.41, he (the purchaser) proposing to buy out the Bostwick claim and foreclose your mortgage, thus cutting off Hugh Ritchie, if he could not settle with him otherwise; but after considerable delay we were finally introduced to the party who proposed buying the property, and it seems he did not understand the matter as the broker represented. He is willing to buy the property and pay the price agreed, but insists on having a perfect title."

Merigold testified upon this question, in response to interrogatories propounded to him by Judd: "Mr. Judd did not agree to purchase the note or mortgage, or both. Mr. Coe and myself and Mr. Hudson went down to the post-office building to see you, and had a conversation with you. I heard you say distinctly that you would not buy the note,—that you wanted a deed to the property from Mr. Ritchie, (Mr. Hugh Ritchie,) and an assignment of the mortgage from John Ritchie, and quitclaim from Bostwick. I think it was said that Mr. Hugh Ritchie had some tax claims,—either John or Hugh Ritchie. I think I saw the contract made between Wentworth, Bostwick and you. There was a sale made under the John Ritchie mortgage, and you bought the property at the sale. Judd paid the commissions of the sale,—defendant Judd. (A check shown him for $500, payable to the order of William D. Kerfoot & Co., and signed S. Corning Judd, indorsed by W. D. Kerfoot & Co. to Mead & Coe.) We were all active in the negotiation for the sale with defendant Judd. I do not think Mead & Coe had anything to do with the negotiations with Judd. The negotiations were between myself, Henry Hudson and Mr. Judd. Mr. Judd was to pay the commission for the sale,—

30—137 ILL.

the sum of $500." This is fully corroborated by the testimony of Coe.

Judd testified: "I was applied to to purchase the John Ritchie note and mortgage, and refused. I did not want to purchase any law suit." He had also previously testified: "I never knew, prior to about the time this contract was signed between Wentworth, Bostwick and myself, that there had been an assignment to Wentworth, or that there was a proposition to make such an assignment. And at the time I signed the contract I did not know that anybody except Wentworth had any interest in the note and mortgage, and made this contract with him accordingly, and with Mr. Bostwick, through his agent. I never made any contract in reference to this property until the one that has been offered in evidence, in writing. The terms of this contract were talked over before it was signed. It was brought to me signed by Wentworth, and perhaps by Bostwick, and then I signed it. According to my recollection it was the latter part of October, 1886. I can not tell when the assignment to Wentworth was shown to me, but I think it was at the time when I signed this contract. I never paid any commissions to any one with respect to that sale, until after the sale of December, 1886."

But it is insisted that the written contract between Wentworth, Bostwick and Judd, on its face, conclusively proves that the sale was collusive, corrupt and against public policy. We are unable to concur in this view. There is nothing in that instrument that tends to prevent competition in bidding. It requires the mortgage to be foreclosed, and the property to be sold, in the manner provided in the mortgage. There is no agreement that the property shall be struck off to Judd, except upon the condition he shall be the highest bidder. Indeed, it contemplates that the property may be bid off by some other person than Judd, for a greater amount than Judd agrees to bid, allowing, in that event, to Wentworth, the option of procuring from that person a conveyance of the property or to

rescind the contract. The agreement is, in effect, simply one with the mortgagee, in advance of a mortgage sale, to bid so much at that sale, without imposing any obligation on the mortgagee to strike the property off to him for that amount. It secures a bid for that amount, but leaves the sale open to the competition of the world, just as fully as it would have been had that agreement not been made. Since Wentworth assumed no legal liability to convey to Judd in the event a higher bidder should compete for the property, it is impossible that, in a legal sense, he could have been interested in having Judd get the property, for if it should be struck off to a higher bidder he would receive from that bidder every cent that he could possibly get from Judd in the event the property should be struck off to him, and the excess of the bid in addition.

So far as John Ritchie's agreement to quitclaim is concerned, we apprehend that Judd obtained no other or different right thereby than any purchaser at the trustee's sale would have obtained, since Ritchie's tax deed, having been taken to protect his interest as mortgagee, would inure to the purchaser of that interest at the mortgage sale. But if this were not true, then Judd would occupy, with reference to this interest, the same position that he does with reference to Bostwick's title. Hugh Ritchie has no right to claim any benefit resulting from consolidating outstanding titles or claims of title to this property. He is entitled to have his interest in the property sold for its reasonable cash value, and he may object to any arrangement or combination of outstanding interests, if there can be such, that will have the legal effect to impair that value. But it is manifest that here, Judd, by contracting for all the outstanding titles or claims of title to the property, bid more for the interest of Hugh Ritchie than he otherwise would, and it is not shown, nor do we perceive how it is possible, that this had any tendency to prevent others from bidding for Hugh Ritchie's interest as much as they otherwise would.

The evidence is direct and unequivocal that the notices of the sale were not prepared by Judd, but that they were prepared by Hudson, the attorney of Bostwick, though they were by him submitted to Judd. But if it be conceded that they were prepared under the supervision of Judd, that fact can not be held to prove that Judd had purchased the note and mortgage and was himself foreclosing, in view of the positive evidence in this record that he had not made such purchase. Having agreed to become a bidder at the sale, it was not unreasonable that he should have a solicitude that the notices should be such as the execution of the power in the mortgage required, and after approving them, he would, doubtless, be estopped to object to the sale on that account; or if the notices in any degree fell short of conveying to the public or to the mortgagor the information the power required, he would doubtless be responsible therefor. But this is not claimed. The notices were in nowise defective, and Hugh Ritchie sustained no injury by reason of them.

It is insisted, as a circumstance tending to mislead, that the property was first advertised, in October, to be sold on the 23d of November, and that the first notice of the sale of the 7th of December was published in the same number of the *Legal News* that contained a notice that the property would be sold on the 23d of November. It is not shown that anybody was misled by these notices, and it is shown that Judd did not direct or control the publication of those first given. An error occurring in the first notices, no other course remained than to re-advertise to sell at a subsequent day, and in the absence of evidence of a bad motive in giving such notices, and of an improper effect resulting therefrom, we can not hold that Hugh Ritchie was prejudiced thereby.

A point is urged, though not alleged in the bill, that the price at which the property was sold was inadequate. The evidence on this point is conflicting, but it can not be said that the preponderance sustains the contention. It is shown

that one or two parties failed to bid for the property because they were advised by their counsel that the title was not good, and it is obvious that by the same amount that Bostwick's title was valued by those desiring to bid at the sale, the value of Hugh Ritchie's title was depreciated. But from the evidence in this record it is clear that if Hugh Ritchie's title was in fact paramount to that of Bostwick, he alone is responsible for not having had that fact established before the agreement between Wentworth, Bostwick and Judd was entered into. He was informed by his attorneys, after Bostwick had filed his cross-bill in the burnt record proceedings setting up that he was the owner of the patent title to the lots in controversy, that Bostwick's title must prevail over his title under his tax deeds unless he could make proof of possession and payment of taxes for the requisite period of limitation under the statute, and the proceeding was continued from time to time to enable him to make that proof, and he failed to make it. He thus permitted the record to stand showing his claim under his tax deeds, unsupported by evidence sufficient to make them a *prima facie* title, for he offered no judgment or precept to support them, which was indispensable, at least before the amendatory act of 1879, (*Eagan* v. *Connelly,* 107 Ill. 464; *Elston* v. *Kennicott,* 46 id. 196,) and Bostwick making claim under his patent title. Since no public record exists showing what proof can be made in each case in regard to possession and payment of taxes, and the claims of individuals in that respect are liable to be magnified because of self-interest, it is impossible that the public could know with accuracy which of these titles was paramount, and the question of title was therefore necessarily so much in doubt that no prudent person would bid the same amount for the title at the mortgage sale that he would be willing to pay for both titles. It is hence obviously not conclusive that the price bid at the mortgage sale was inadequate, merely because the amount was less than witnesses think was the value of the

property, which means the value of a perfect title.  The number of witnesses testifying to valuations showing that the price bid was not inadequate is greater than the number testifying the other way, and these show quite as much accuracy of discrimination and intelligence in respect of the matters to which they testify, as do those.

There is earnest insistence in argument to the effect that the evidence proves that appellant had a right to rely upon Mead & Coe to prevent the property from being sold, or, if they could not prevent that, at all events to give him timely notice of the sale, that he might himself take steps to protect his rights.  The power of sale was, by its own terms, assignable, and it is not questioned but that the conveyance by John Ritchie to Wentworth was a lawful assignment of it.  The evidence in the record proves that Judd had no knowledge, prior to his purchase, of the relations between Mead & Coe and John Ritchie, and Mead & Coe and Hugh Ritchie, and Mead & Coe and Wentworth; that he contracted with Wentworth believing that he was the owner of the indebtedness secured by the mortgage, and the *bona fide* assignee of the power of sale to protect his own interest; and so, by the voluntary act of Hugh Ritchie in executing this mortgage, he authorized John Ritchie to put the execution of the power in the hands of Wentworth, and authorized Judd, and the balance of the public having no notice to the contrary, to deal with Wentworth as if the power had been executed to him in the first instance.  He and they were charged, at their peril, to know, before purchasing, that the conditions precedent to the exercise of the power, as its terms provided,—that is, that the debt was due and unpaid, and that the requisite notices of the time and place of sale were published; but they were under no obligation to make inquiries not affecting the conditions precedent to the exercise of the power.  It is not claimed that the note had been paid, and the evidence wholly fails to support any pretense that the time for the payment

of the note was, by contract, extended to a period beyond the day of sale, or that by a valid contract the power was canceled.

Although, under the evidence, we do not think that Judd can be held responsible for any betrayal of the trust of Mead & Coe to Hugh Ritchie, it is not impertinent to the case to say that, in our opinion, the evidence fails to show that Mead & Coe were guilty of such betrayal. A sufficient outline of the facts material to this phase of the case is: John Ritchie put the note and mortgage in the hands of Mead & Coe for collection some time in the year 1880. Soon afterwards Hugh Ritchie, being unable to pay the note, placed the mortgaged property in the hands of Mead & Coe for private sale, John Ritchie forbearing to press for immediate payment of the note, so as to give time to raise the requisite money by private sale. In this arrangement Mead & Coe were still the agents of John Ritchie, and they were only agents of Hugh Ritchie to the extent of effecting a private sale of the property, and, necessarily, when it was ascertained that the property could not be sold at private sale, their agency for Hugh Ritchie would at once be terminated. When the private sale to Batterman failed because of the inability of Hugh Ritchie to furnish a satisfactory abstract of title, the evidence shows no further efforts were made by Mead & Coe to sell the property at private sale, and although Hugh Ritchie makes some claim to the contrary, the evidence clearly preponderates that before the agreement between Judd, Wentworth and Bostwick was entered into, he had ceased to treat and rely upon Mead & Coe as his agents for any purpose. Mead and Coe each testified that this was the fact, and Hugh Ritchie himself, in effect, admits it in his testimony, for, in speaking of his having terminated their agency, he said: "On the 5th day of October, in Lyman & Jackson's office, with Mr. Mead, in the way they acted I felt inclined to look somewhere else for my interest. I could see that they were working against me. I may have said, on my direct examination, that I would have nothing

more to do with him. After I notified Mr. Mead that I would have nothing more to do with him, did not take steps to prevent a foreclosure. Took steps to tie it up by filing a document of ownership in the recorder's office." There is also evidence in the record warranting the chancellor in coming to the conclusion that a demand had been repeatedly made upon Hugh Ritchie for the payment of the note, and that he knew, when he had the interview, to which he above alludes, with Mead & Coe, that steps would be taken immediately to sell the property pursuant to the terms of the mortgage, and there is no ground in the evidence for claiming that any contract existed for the extension of time for the payment of the note or for the suspension of the execution of the power of sale. The evidence fails to prove any privity between Judd and Mead & Coe prior to his purchase, or any knowledge and approval by him of acts done or omitted by them to the prejudice of the rights of Hugh Ritchie, and there is therefore no ground upon which his title can be avoided because of their failure to perform their duty to Hugh Ritchie.

It appears that after the execution of the deeds to Judd, pursuant to his purchase on the 7th of December, 1886, and his agreement with Wentworth and Bostwick, he, having some doubt whether the note had been assigned to Wentworth before the first notice for that sale was published, procured Wentworth to re-advertise the property to be sold on the 13th of January, 1887, and to then again sell it at public auction, and that at that time, and before the property was sold, an agent of S. H. Kerfoot, who claimed through Bostwick, gave public notice that he had a claim upon the property, whereupon an agent of Judd announced that Judd claimed to be the owner of the property, and that then the sale proceeded, and the property was again sold to Judd, and it is thereupon contended, first, that Judd is thereby estopped to now claim that the sale on the 7th of December was valid; and second, that the notices given by Kerfoot and Judd on the 13th of

January, 1887, prevented competition in bidding, and rendered that sale void. It is sufficient for the present that the bill does not question the validity of the sale of December 7, because the note was not assigned before the first notice of the sale was published, and there is nothing in this record to impeach the sale on that ground. We must therefore assume that Judd's fears were not well founded, and, the first sale being regular, the power of sale was exhausted, and the sale on the 13th of January, 1887, was a nullity. The doctrine of estoppel can have no application, for the very obvious reason that no one is here claiming any right in this property, other than Judd, upon the faith of Judd's re-advertising it for sale. Had some one, other than Judd, acted to his prejudice upon the faith of that advertisement, it might be that the doctrine of estoppel could be invoked; but whether so or not is irrelevant to any question now before us.

It may be observed, though it is of no importance in the decision of the case, that it does not appear that any one was present on the 13th of January, 1887, who would have bid upon the property had not the claims in behalf of S. H. Kerfoot and Judd been made, and who was prevented from bidding by the assertion of those claims.

We are, upon the whole, unable to say that the decree below is not authorized by the evidence preserved in the record, and it is therefore affirmed. The clerk will tax the costs of appellees' abstract to appellant.

*Decree affirmed.*

MAGRUDER, J.: I am unable to concur in the view of this case presented by the opinion, or in the conclusion reached by it.